MARGARET E. McCABE AND FRANCIS McCABE, PLAIN-
TIFFS-RESPONDENTS, v. NEW JERSEY TURNPIKE
AUTHORITY, DEFENDANT-APPELLANT.

JOSEPH KAPCAR, PLAINTIFF-RESPONDENT, v. NEW JER-
SEY TURNPIKE AUTHORITY, DEFENDANT-APPEL-
LANT.

Argued February 6, 1961—Decided May 8, 1961.

28

*Mr. James P. Beggans* argued the cause for defendant-appellant (*Messrs. Beggans & Keale,* attorneys; *Mr. James P. Beggans,* of counsel; *Mr. Robert E. Tarleton,* on the brief).

*Mr. William M. Feinberg* argued the cause for plaintiffs-respondents (*Messrs. Feinberg, Dee & Feinberg,* attorneys for plaintiffs-respondents Margaret E. McCabe and Francis McCabe; *Mr. Leo H. Bergman,* attorney for plaintiff-respondent Joseph Kapcar).

The opinion of the court was delivered by

SCHETTINO, J. These are negligence actions for personal injuries and property damage sustained by plaintiffs as a result of an accident that occurred on the Newark Bay extension of the New Jersey Turnpike. Originally two actions were instituted and thereafter consolidated for trial. This appeal is from certain judgments entered on jury verdicts in favor of plaintiffs. We certified on our own motion while the cause was pending in the Appellate Division.

On March 20, 1958 at about 5:30 A. M. a snow alert was declared on the Turnpike. At approximately 8:15 A. M., plaintiff Margaret McCabe and Catherine Smith were passengers in an automobile owned and operated by plaintiff Kapcar, traveling westerly on the New Jersey Turnpike bridge between Bayonne and Newark. It had snowed the night before. At this time the weather was "very bad," there was "mixed snow and rain" and the surface of the turnpike was "slushy." As the car proceeded over the bridge there was a "tremendous crash" and a "terrific jolt in the car." A "great mass of ice and snow" had fallen from the overhead superstructure,

broken the windshield, dented the car roof, filled the car with ice and snow and injured Mrs. Smith, Mrs. McCabe and Mr. Kapcar.

Kapcar testified that as soon as he went under the superstructure he saw ice and snow falling "all around." After the accident he saw additional pieces of snow and ice falling and "heard them popping all over the road." He also testified that when he got on the turnpike at the interchange, there was no sign relative to weather conditions, nor was there a sign at the superstructure warning against falling ice and snow. This fact was substantiated by the Assistant to the Executive Director of the Turnpike Authority. Nor was there any way in which he could have turned around and gone off the turnpike.

A witness, who arrived at the scene soon after the accident, testified that he saw patches of snow and ice falling from the superstructure and estimated that their measurements "varied from snowball size to sizes of maybe one or two cubic feet." The state trooper who investigated the accident testified that he too saw ice and snow falling from the overhead structure, some of which cracked the windshield of his police car. The Traffic Engineer of the Turnpike Authority testified that from time to time reports were received of incidents involving the falling of ice and snow from Turnpike bridges resulting in property damage to vehicles and personal injury to persons in the vehicles.

Plaintiffs introduced testimony of a similar accident which had taken place six days before. A Mr. Feinman testified that on March 14, 1958 at about 8:15 A. M. he was traveling easterly over the same Turnpike bridge between Newark and Bayonne. It was snowing and the weather was "nasty" and that while he was under the superstructure "a chunk of ice came flying down" from a sign and "hit my windshield and cracked it." He added that he saw "plenty of ice falling that day." After the incident he explained to a toll collector what had happened and later gave the same explanation to a state trooper, indicating the sign from which the ice fell.

A copy of the state trooper's report of that incident was filed in the Turnpike Building at New Brunswick. Plaintiffs introduced weather reports of the United States Department of Commerce for the month of March 1958 in an effort to establish the similarity of the weather conditions on March 14 and March 20.

An expert witness for plaintiffs testified as to certain devices which might be used to prevent the formation and accumulation of ice and snow on the superstructure. In his opinion "it would be feasible to protect the bridge from the build-up of ice and snow by means of radiant heat cables" and also, "one other possibility * * * would be by the use of chemical liquid which would have to be sprayed on at the time that any build-up would be anticipated." On cross-examination, he admitted that he was unaware of any bridge of the size and type of the Turnpike structure on which were used radiant heating and chemical spraying. Although defendant objected to certain parts of the expert's testimony, it did not object to testimony concerning these two suggested plans.

In its answer defendant reserved the right to rely on the defense of sovereign immunity from suit, but before trial it agreed to eliminate that issue from the action. Defendant now attempts to distinguish between consent to suit and a concession that it is liable under ordinary principles of negligence. It argues that the question whether a state turnpike authority can be sued for its negligent acts is distinct from the question whether, if amenable to suit due to legislative consent, it can be held liable where the contention is made that the act which is complained of was done in carrying out a governmental as distinguished from a proprietary function. Defendant, in effect, maintains that its responsibility should be confined within the limited concepts of municipal liability. We disagree.

Few states have broken away completely from the rule which renders them immune from tort liability. New York by statute has rendered itself and all its agencies and political

subdivisions generally liable for torts. The statute provides: "the state * * * waives its immunity from liability and action and * * * assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions * * * against individuals or corporations. * * *" *N. Y. Ct. Cl. Act,* § 8. See *Muskopf v. Corning Hosp. Dist.,* 11 *Cal. Rptr.* 89, 359 *P. 2d* 457 (*Sup. Ct.* 1961). For a summary of the tort liability of the various states, see 29 *N. Y. U. L. Rev.* 1363 (1954).

The general rule in the United States is that state highway or turnpike authorities are agencies of the state and are therefore entitled to the protection of the rule of sovereign immunity. Thus, an action for negligence will not lie against such an agency except where there has been a waiver of the immunity which the state enjoys. *Taylor v. New Jersey Highway Auth.,* 22 *N. J.* 454, 467 (1956). For a collection of cases, see Annotation 62 *A. L. R. 2d* 1222, 1224 (1958) and see also "The Applicability of Sovereign Immunity To Independent Public Authorities" 74 *Harv. L. Rev.* 714 (1961). But see *Gerr v. Emrick,* 283 *F. 2d* 293 (3 *Cir.* 1960), *certiorari* denied *Pennsylvania Turnpike Comm. v. Gerr,* 365 *U. S.* 817, 81 *S. Ct.* 698, 5 *L. Ed. 2d* 695 (1961), wherein it was held that the Turnpike Commission was not the *alter ego* of the Commonwealth of Pennsylvania and the latter's immunity was not imputable to it.

In keeping with the general legislative unwillingness to break with the immunity doctrine, the majority of courts have been reluctant to construe consent provisions as authorizing liability for ordinary negligence unless the statute clearly so states. Thus, provisions which grant state highway authorities the power "to sue or be sued" usually have been held to authorize only such actions as are necessary to carry out the business of the agency and not to authorize negligence actions. See 74 *Harv. L. Rev., supra,* at *pp.* 718 *et seq.* and 62 *A. L. R. 2d, supra,* at *p.* 1232 (1958). Illustrative of this principle is the case of *Kilberg v. Louisiana*

*Highway Comm.*, 8 *La. App.* 441 (*Ct. App.* 1928), where the statutory provision empowering the state highway commission to sue and be sued was held not to authorize an action for negligence. The court noted that the statute was silent as to which causes of action were authorized and stated that the legislature had not intended to create a right of action by which the commission would be deprived of funds appropriated for the execution of governmental functions.

The statute creating the New Jersey Turnpike Authority contains such a provision. *N. J. S. A.* 27:23–5(d). We have interpreted a like provision as authorizing negligence actions with reference to a similar authority, *Taylor v. New Jersey Highway Auth.*, 22 *N. J.* 454 (1956), and not merely suits on consensual and property claims. *Karp v. High Point Park Comm.*, 131 *N. J. Eq.* 249 (*Ch.* 1942), affirmed 132 *N. J. Eq.* 351 (*E. & A.* 1942). In *Taylor* plaintiff sustained injuries as a result of the alleged negligence in the maintenance of a building which had been condemned by the New Jersey Highway Authority. Mr. Justice Jacobs noted (22 *N. J.*, at *p.* 467) that the statutory provision that the Authority can sue and be sued in its own name indicated a legislative intent that the Authority shall be liable at least to some extent. He stated (at *p.* 470) that the federal decisions persuasively point out that the doctrine of governmental immunity from suit is currently in disfavor and that express or implied authority to sue and be sued should be considered as sufficient to enable suits in tort as well as contract. He further stated (at *p.* 470):

"The hostility towards the doctrine of governmental immunity is also evidenced in the states and it seem to us that pertinent statutory waivers should fairly receive as liberal construction in the states as in the federal sphere. In recent years there has been a noticeable tendency of legislative bodies to entrust to independent Authorities, functions which necessitate relationships comparable to those ordinarily existent between private parties. It would seem that in all justice such Authorities should generally not be afforded the highly

special immunities of the State acting in its sovereign capacity; that much has been recognized by the New Jersey Highway Authority Act, particularly in its broad terminology which unrestrictedly permits the Authority to sue and be sued in its own name."

It is true that we did not pass on the question of whether, in spite of the waiver of immunity from suit, the responsibility of the Authority should be limited within the concepts of municipal liability.

As stated by Mr. Justice Weintraub in *Cloyes v. Delaware Twp.,* 23 *N. J.* 324, 327 (1957), the doctrine of municipal immunity "has been traversed time and again." In that case the evolutionary development of this area of the law was comprehensively retraced and the inequalities which resulted from a strict adherence to a doctrine which was formulated for a society totally unlike that in the twentieth century were detailed. It is sufficient to point out that the doctrine has met with great disfavor, 2 *Antieau, Municipal Corporations* 93–98 (1955); 18 *McQuillin, Municipal Corporations* 205 (1950); *Prosser, Torts* 774–775 (1955), and that the so-called distinction between governmental and proprietary activities is a poor determinant of municipal tort liability. *Cloyes, supra,* 23 *N. J.,* at *p.* 327; 2 *Antieau, supra,* at *p.* 95. We refuse to burden further the already troublesome area of the law of state immunity with "hairline distinctions" which are "elusive and unsatisfactory" and often most artificial. 2 *Harper and James, Law of Torts* 1622–23.

Critical writers have made it clear that the doctrine of sovereign immunity has little relevancy to modern day concepts of justice. See Leflar and Kantrowitz, "Tort Liability of the States," 29 *N. Y. U. L. Rev.* 1362 (1954); Borchard, "Governmental Responsibility in Tort," 34 *Yale L. J.* 1, 129, 229 (1924–25); 36 *Yale L. J.* 1, 757, 1039 (1927); 28 *Colum. L. Rev.* 577, 734 (1928); 2 *Harper and James, supra,* 1611, 1612. We re-emphasize that "pertinent statutory waivers should fairly receive as liberal construction." *Taylor, supra,* 22 *N. J.,* at *p.* 470. As stated by Justice

Cardozo in *Anderson v. John L. Hayes Constr. Co.*, 243 *N. Y.* 140, 147, 153 *N. E.* 28, 29 (*Ct. App.* 1926):

"The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced."

 The characteristics of the New Jersey Turnpike Authority indicate a legislative willingness that the Authority be liable in these circumstances. The Authority is an independent corporate entity. *New Jersey Turnpike Auth. v. Parsons*, 3 *N. J.* 235, 243 (1949). It exercises a number of powers free of any great legislative supervision. *N. J. S. A.* 27:23–5 empowers the Authority to sue and be sued, to issue turnpike revenue bonds payable from tolls, to acquire, hold and dispose of real property, to exercise the power of eminent domain and to fix tolls. This last-mentioned power to fix tolls takes on significance when it is considered that the burden of payment of tort judgments rendered against the Authority would ultimately fall upon the users of the Turnpike facilities rather than the State. Additionally, as the Authority has the power to fix the amount of tolls, the payment of tort judgments can be satisfied by increasing, if necessary, the toll charges. Weighted consideration should also be given to the fact that the Authority has passed a bond resolution requiring it to carry a public liability insurance policy providing for blanket coverage of claims arising from Turnpike operations. While none of these factors when considered alone points to a rejection of immunity, when taken together they compel the conclusion that the Legislature intended to create an independent body which would be responsible for negligently inflicted wrongs. *Linger v. Pennsylvania Turnpike Comm.*, 158 *F. Supp.* 900 (*D. C. W. D. Pa.* 1958).

 Defendant also contends that plaintiffs failed to establish a *prima facie* case and, therefore, the issue of negligence should not have been submitted to the jury. Defend-

ant Authority is charged with the duty to use due care to keep its roads in a reasonably safe condition for public travel. 54 *Am. Jur., Turnpikes and Toll Roads* § 19 (1945); 90 *C. J. S. Turnpikes and Toll Roads* § 68 (1955). Negligence is tested by whether the reasonably prudent person would recognize and foresee an unreasonable risk or likelihood of harm or danger to others. The standard of care is the conduct of the person of ordinary prudence under the circumstances. *Rappaport v. Nichols,* 31 *N. J.* 188, 201 (1959).

■ As noted above there was testimony of a similar accident which occurred six days before this accident on the same superstructure and under almost identical weather conditions. This was investigated and reported to Turnpike Headquarters in New Brunswick. As stated above the Traffic Engineer for the Turnpike Authority testified that from time to time reports were received of incidents involving falling ice and snow from Turnpike bridges resulting in property damage and personal injury. From this testimony, the jury could have found that a person of ordinary prudence would have apprehended the danger of falling ice and snow and the probability of resulting injuries to travelers passing under the superstructure and would have taken proper steps to remedy or guard against the dangerous situation. The jury could have found that defendant, as a reasonably prudent person, should have, as suggested by plaintiffs' expert witness, made use of radiant heat cables or a chemical spray, or, if these were unreasonable, should have removed the accumulation immediately to minimize the danger, or should have posted warnings of the dangerous condition of the superstructure, or, if absolutely necessary, should have closed down that section of the turnpike. We conclude that plaintiffs did establish a *prima facie* case.

■ Defendant objects to the admission into evidence of the testimony concerning the March 14, 1958 accident on the grounds that it was erroneous and prejudicial. The contention is without merit. Evidence of the accident which occurred on the same superstructure six days prior to the

one at bar was relevant to prove notice of a dangerous condition on defendant's part. *Harpell v. Public Serv. Coordinated Transp.*, 35 *N. J. Super.* 354, 359 (*App. Div.* 1955), affirmed 20 *N. J.* 309 (1956). While it is true that proof of that incident had no bearing on whether defendant had actual knowledge of this specific accumulation of ice and snow, it did raise the inference that defendant was charged with knowledge of impending danger which might exist under similar circumstances in the future. No express notice is required if the circumstances would cause a person of ordinary prudence to apprehend the danger. 90 *C. J. S. Turnpikes and Toll Roads* § 70 (1955). That in the March 14 incident a piece of ice fell from a sign rather than from the superstructure is of no help to defendant. Indeed, the fact that the ice which fell from a small sign caused damage should have apprised the defendant of the likelihood that snow and ice would accumulate and fall from the superstructure which is of a greater size and is capable of acting as a bigger and more dangerous receptacle.

██ Defendant also objects to the trial court's charge to the jury as to the application of the doctrine of *res ipsa loquitur*. The doctrine is frequently applied to aid a plaintiff who has insufficient knowledge as to why an accident happened and because the true explanation of the accident is more accessible to the defendant than to the plaintiff. See *Hansen v. Eagle-Picher Lead Co.*, 8 *N. J.* 133, 140 (1951). The doctrine is also stated to be just a method of proof and means no more than that negligence can be inferred from the circumstances of the case. *Meny v. Carlson*, 6 *N. J.* 82, 91 (1950). It is known that the ice and snow fell because they were not removed from or were not prevented from forming on the superstructure. Defendant should be made to explain what it could have done, if anything, to prevent the accident. Plaintiffs are not familiar with turnpike operations and it is perfectly reasonable that defendant be made to justify its failure to act on this

occasion. Consistent with that doctrine the trial court at the defendant's request charged the jury as follows:

"If you find that the defendant could not have taken any precautionary measures to prevent the occurrence of the accident in this case, you must return a verdict of no cause of action in favor of the defendant and against the plaintiffs. If you find that the defendant could not have controlled the accumulation of ice and snow on the superstructure of its bridge by any known means and that it gave adequate warning of the condition of its highway, including the condition of the superstructure involved here, if you find it was in the condition, as you may find from the proofs—namely, a superstructure from which huge or large masses of ice fell or were falling—then you must return a verdict in favor of the defendant and against the plaintiffs of no cause of action."

As we view the overall charge, it sufficiently charged the jury as regards the applicable law.

Affirm.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.