76 N.J. Super. 359 (1962)
184 A.2d 659
THE PORT OF NEW YORK AUTHORITY, PLAINTIFF,
v.
PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT; AND THE PORT OF NEW YORK AUTHORITY, PLAINTIFF,
v.
NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided October 1, 1962.
*360 Mr. Francis A. Mulhern, attorney for plaintiff (Mr. Sidney Goldstein of the New York Bar, of counsel).
Mr. Henry J. Sorenson, attorney for defendant, Public Service Electric and Gas Company.
Mr. Michael J. O'Neil, attorney for defendant, New Jersey Bell Telephone Company (Mr. Sidney D. Weiss on the brief).
CONKLIN, J.S.C.
These actions were consolidated at the time of pretrial, as they involved common questions of law and could be conveniently tried together.
The Port of New York Authority, hereinafter called "Port Authority," was created by compact between the State of New Jersey and the State of New York with the approval of Congress. The Public Service Electric and Gas Company, hereinafter called "Public Service," is a privately owned utility corporation of the State of New Jersey engaged in the sale of gas and electricity. The New Jersey Bell Telephone Company, hereinafter termed "Bell Telephone," is also a privately owned utility engaged in furnishing communication services to the public. Both defendants maintain facilities in street and highway right of ways for the dispensing of their services to the public. The Port Authority seeks by these two actions the recovery of money paid to the defendants under various agreements for the removal and relocation of utility facilities of defendants.
The plaintiff had "directed" the removal and relocation of the facilities in question. The defendants refused to comply *361 with the "directives," expressing the belief that they, as privately owned public utilities, had the lawful right to maintain the facilities in the various locations and the plaintiff was without lawful right to direct their removal. However, the defendants expressed a willingness to make the relocations or removals if the plaintiff would pay the costs and expenses connected therewith. The plaintiff agreed to and did make the necessary payment of costs and expenses, reserving the right to institute such litigation as it might deem necessary to determine its legal obligation, if any, to make such payments.
The issue before this court is whether the Port Authority has the power to compel the defendant utilities to remove and relocate their facilities at their own expense. Therefore, it is necessary to determine whether any legislation has expressly or impliedly delegated to the Port Authority a power to require uncompensated utility relocation in the public streets or whether the Port Authority has been assigned a status giving it such power as a common-law or inherent right. The express powers given to the Port Authority (R.S. 32:1-7) were only those which were necessary to sustain contractual validity of its acts in purchasing, constructing, leasing and operating terminal or transportation facilities. The following section (R.S. 32:1-8) states that the Port Authority "shall have such additional powers and duties as may hereafter be delegated to or imposed upon it from time to time by the action of the legislature of either state concurred in by the legislature of the other."
Even in those areas originally designated as the prime concern of the Port Authority, i.e., establishing "a comprehensive plan for the development of the port" (R.S. 32:1-7) and making "rules and regulations * * * for the improvement of the conduct of navigation and commerce" (R.S. 32:1-19), its actions were completely ineffective unless approved, concurred in, or authorized by the legislatures of both states. Hence, the language of the compact (R.S. 32:1-1 through 32:1-24) would suggest the creation of a *362 corporate entity for a public rather than a private purpose  however, a public entity to which the legislatures would delegate specific governmental powers only if they so elected and only by express language.
The power to require uncompensated relocation of utility facilities maintained in the public street by governing body resolution after hearing upon notice is expressly given to the municipalities of the State. R.S. 40:67-7. Despite the fact that the Port Authority is to "be regarded as a municipal corporate instrumentality" of New York and New Jersey (R.S. 32:1-33), the Port Authority cannot be regarded as deriving its powers as a municipality from Title 40, for the Legislature has found it necessary to give the Port Authority even the most basic indicia of a municipal body by express legislation. N.J.S.A. 32:1-154.1 et seq.
The Port Authority contends that the grant of "all necessary and appropriate powers" (R.S. 32:1-33) constitutes the granting of very broad police powers to it as a governmental agency of the State. Defendant utilities urge that a grant of sovereignty is not effectuated in such a vague manner under New Jersey law.
"The State has sovereign and absolute jurisdiction and control of the roads, streets and highways within its borders. Supervision and control of public highways is exercisable directly by the Legislature, and indirectly by the municipalities and other local governmental agencies to whom the power has been delegated. The local governing body has in this behalf only such powers as have been delegated by the State's legislative body." Hackensack Water Co. v. Ruta, 3 N.J. 139, 146 (1949)
If the effect of the "all necessary and appropriate powers" clause was as plaintiff contends, it would have been idle for the Legislature to have expressly granted specific powers necessary for the operation of its bridges and tunnels. For example, having charged the plaintiff to build and operate a bridge for vehicular traffic and to charge tolls for it, if the above quoted section had the effect which plaintiff claims, there would have been no reason for the Legislature specifically to approve and make effective the Port Authority's *363 rules and regulations on tolls, as it did in N.J.S.A. 32:1-128, R.S. 32:1-147 (now N.J.S.A. 32:1-154.2), and R.S. 32:2-25. In addition, it would have been unnecessary expressly to authorize penalties against those who violated its regulations and to permit these violations to be prosecuted in the local municipal courts. These powers are eminently more necessary and appropriate for the Port Authority than the power to compel utility companies to pay part of the cost of the construction of the bridges and tunnels. However, the fact that the Legislature did grant these powers expressly is consistent with its whole practice of leaving no significant intended power to rest on implication.
In the absence of specific legislative authorization, the Port Authority was found to lack the power to construct a third tube for its already existing Lincoln Tunnel. Port of N.Y. Auth. v. Weehawken Tp., 14 N.J. 570 (1954). The court stated at page 577 that "so all-encompassing a delegation of power in a matter of such public importance and consequence should not be lightly inferred but ought plainly appear."
Therefore, it is concluded that the Legislature not only declined to give express authority to the Port Authority to compel uncompensated relocation, but also that those general powers given should not be inferred to extend beyond the incidental aspects of the Port Authority's functions.
With respect to the George Washington Bridge, the New Jersey Legislature was explicit in commanding that all expenses of constructing that facility, including even those for incidental purposes, be paid for by the Port Authority. In connection with the construction of the bridge, the States of New Jersey and New York provided for a loan of not more than $10,000,000 to the Port Authority. R.S. 32:1-84 et seq. The Legislature added in R.S. 32:1-86:
"The balance of the money needed for the construction of the said bridge and incidental purposes shall be raised by the port authority on its own obligations secured by the pledge of the revenues and tode arising out of the use of the said bridge."
*364 It is difficult to believe that the Legislature intended to exempt from such broad coverage a legitimate construction cost such as the relocation of utility facilities. A finding that it did would be totally inconsistent with the directive that the facilities be in all respects self-sustaining.
Defendants concede that more recently enacted legislation has contained specific reference to relocation costs in imposing them upon other entities. For example, the provisions imposing the costs of relocating utility facilities upon the State Highway Commission with respect to freeways and parkways adopts the following language (N.J.S.A. 27:7A-7):
"Whenever the State Highway Commissioner shall determine that it is necessary that any [public utility] facilities which now are, or hereafter may be, located in, on, along, over or under any such freeway or parkway should be relocated in such freeway or parkway, or should be removed from such freeway or parkway, the public utility owning or operating such facilities shall relocate or remove the same in accordance with the order of the State Highway Commissioner; provided, however, that the cost and expenses of such relocation or removal, including the cost of installing such facilities in a new location, or new locations, and the cost of any lands, or any rights or interests in lands, and any other rights, acquired to accomplish such relocation or removal, shall be paid by the State Highway Commissioner * * *."
Similar language is used in imposing said costs on the following entities, among others:
N.J.S.A. 27:12B-6 (New Jersey Highway Authority)
N.J.S.A. 27:23-6 (New Jersey Turnpike Authority)
N.J.S.A. 40:14A-20 (municipal sewerage authorities)
N.J.S.A. 55:14A-39 (municipal housing authorities)
N.J.S.A. 27:12C-16 (N.J. Expressway Authority)
N.J.S.A. 40:68A-54 (municipal port authority)
However, the fact that the legislative mandate pertaining to the Port Authority is couched in language not specifically referring to "relocation costs," as are the foregoing more recently enacted provisions, is immaterial. It is entirely possible for dissimilar legislation to achieve a similar or identical *365 result. Delaware River Trans. Co. v. Trenton, 85 N.J.L. 479 (Sup. Ct.), affirmed 86 N.J.L. 680 (E. & A. 1914); Baltimore Gas and Electric Co. v. State Roads Com'n., 214 Md. 266, 134 A.2d 312 (Ct. App. 1957). It may be assumed that such specificity represents an awareness of impending disputes and a recognition of a public policy which was pointed out by Leander I. Shelley, a former General Counsel of the Port Authority, when he wrote that
"* * * as a matter of public policy it is more appropriate to charge costs of any re-locations of public utilities necessitated by bridge construction against the bridge, where they will be ultimately charged against the users of the bridge, rather than to attempt to charge them against the public utility companies, where they will be ultimately charged against the consumers who as a class will not be necessarily benefited by the construction of the bridge. We feel that this is in accordance with the fundamental principles of public policy and economics underlying the organization of the Port Authority." Letter to T.H. Beardsley, Esq., August 8, 1930 (DT-33)
The absence of such unequivocal articulation in the problem before us does not mean that the intent of the broader language pertaining to the Port Authority, which requires it to pay all costs of construction, should be completely disregarded and denied its natural meaning.
Our Supreme Court has recognized and delineated the unique characteristics of independent autonomous agencies performing functions of government. It has emphasized that the public policy underlying their establishment demonstrates that such agencies have not been endowed with all the basic attributes of sovereignty.
In Taylor v. N.J. Highway Authority, 22 N.J. 454 (1956), Justice Jacobs, speaking for the court, stated:
"In recent years there has been a noticeable tendency of legislative bodies to entrust to independent Authorities, functions which necessitate relationships comparable to those ordinarily existent between private parties. It would seem that in all justice such Authorities should generally not be afforded the highly special immunities of the State acting in its sovereign capacity * * *." (at p. 470) *366 Justice Jacobs was referring to the New Jersey Highway Authority, and his frame of reference was to the prerogative of sovereign immunity. But his comment is no less applicable to the Port Authority in the case sub judice with respect to another of the "highly special [attributes] of the State acting in its sovereign capacity," to wit, the police power to uncompensated relocation of utility facilities.
This concept was quoted with approval and reasserted in McCabe v. New Jersey Turnpike Auth., 35 N.J. 26 (1961), where the Supreme Court considered the character of the New Jersey Turnpike Authority in reaching the conclusion that said entity was responsible for negligently inflicted wrongs in the exercise of its governmental as well as its proprietary functions.
As the characteristics of the Turnpike Authority in the McCabe case as an independent corporate entity negated the existence of one attribute of sovereignty, so the characteristics of the Port Authority here negate the existence of its asserted power to compel uncompensated utility relocation.
This court observes that the Port Authority has patterned its activities after the modes prevalent in private corporate management rather than adopting the framework of traditional government agencies. Its own Executive Director, Mr. Austin J. Tobin, has testified that Port Authority was established with the basic concept that "it would follow the very best and efficient policies of good private American corporate management, and bring that efficiency to public affairs." Hearings before Subcommittee No. 5 of the House Committee on the Judiciary (Celler Committee), 86th Cong., 2d Sess., Ser. 24, pt. 1, at p. 923 (1960). The adoption of such a policy has naturally lead to the development of an image, both in minds of Port Authority directors and those observing its operation, of a governmental operation in the private corporation tradition rather than that attributed classical governmental organization. This development lends substance to the policy expressed by the Supreme Court in the McCabe and Taylor cases. Such a realization serves to *367 fortify an analysis that it is unreasonable to infer governmental powers which were not unequivocally granted by the State Legislature.
Plaintiff relies heavily upon Port of N.Y. Authority v. Hackensack Water Co., 73 N.J. Super. 332 (Law Div. 1962), which recognizes the common-law relocation rule as controlling an extremely similar situation. The court stated the rule as follows:
"A utility company which maintains facilities in the public streets by virtue of such a grant has no vested right to maintain its facilities in any specific location in the public streets, its right being conditioned upon its obligation to remove and relocate them from one place to another at its own expense when the public convenience or necessity requires." (at p. 338)
The rule in New Jersey in one form or another can be traced back at least to Jersey City v. City of Hudson, 13 N.J. Eq. 420 (Ch. 1861), wherein it was held that the right of a public utility (a water company) "to use the ground or soil under any road * * * is to be exercised in subordination to the public right of way" (at p. 423). Furthermore, it should be pointed out that the location, construction, and maintenance of utility facilities in the public street are required not "to interfere with the safety or convenience of persons traveling on or over said" streets, and are subject to municipal authority as to location by express legislation. e.g., L. 1875, c. 226, p. 211 (Private Acts).
Stating the basic rule as it applies to municipalities does not without more exempt the Port Authority from liability for the costs of relocation. The court in Port of N.Y. Auth. v. Hackensack Water Co., supra, stressed three New Jersey decisions in sustaining plaintiff's position. In analyzing these cases it is difficult to ascertain in which manner they are controlling upon the present controversy.
Walker v. Township of North Bergen, 84 N.J.L. 248 (Sup. Ct. 1913), an action brought by a taxpayer challenging the award of a sewer construction contract, is controlled by the rationale that "a natural sense of justice demands *368 that the expense of shifting and relocating [public utility facilities] should be borne by the companies owning them, and not by the taxpayers" (at p. 250; emphasis added). It should be pointed out that the Port Authority is tax exempt and that placing the burden of relocation upon the public utility constitutes a shifting of that cost to a tax-paying entity  completely contrary to the expressed rationale. Further, since the utilities were not parties to that litigation, their legislatively granted franchise rights were not properly before the court.
Postal Tel. Cable Co. v. D.L. & W.R.R. Co., 89 N.J. Eq. 99 (Ch. 1918), affirmed 90 N.J. Eq. 273 (E. & A. 1919), presented the question whether either the municipality or county should bear the expense of temporary relocation of telegraph poles made necessary by an agreement between the municipality, the county and the railroad company to abolish a grade crossing pursuant to the provisions of the Railroad Act. The plaintiff cable company asserted its rights under the act of Congress permitting telegraph companies to maintain poles along "post roads," rather than in accordance with a legislative grant or franchise given to the telegraph company by the New Jersey Legislature. L. 1875, c. 226 (Private Acts). The court, in finding that the utility could neither enjoin the municipality from changing the grade nor recover the costs of relocation, based its opinion solely on the relationship which existed between the municipality and the utility. In the case sub judice the Port Authority, which is not a municipality, as the term is used in Title 40 and in the Postal Telegraph case, is attempting to assert its alleged power against franchise rights given directly to the defendants by this State.
Although N.J. Bell Tel. Co. v. Delaware River Joint Comm., 125 N.J.L. 235 (Sup. Ct. 1940), arose out of a factual dispute similar to the present one, the only point decided was that the utility could not compel the Delaware River Joint Commission to begin a condemnation action to accomplish reimbursement. Plaintiff instituted mandamus *369 proceedings to compel the defendant commission to condemn, as a method of reimbursing it for moneys expended in relocating certain telephone facilities in connection with the construction of the subway along Fifth Street in Camden, New Jersey. The court pointed out that the commission under its compact was authorized to purchase the enumerated interests defined in the compact by agreement upon price with the owner, and that it was further empowered to condemn and to take upon payment of the amount fixed in the condemnation proceedings, "but that the compact placed no obligation upon the Commission to pursue either course and that since it has not done so it is under no duty or obligation by the provisions of the compact to compensate for damages inflicted by its acts and is subject only to such liability as is otherwise imposed by the laws of the state" (at p. 238; emphasis added). Thus, the court held that it could not by extraordinary remedy of mandamus compel the commission to condemn. The decision turned on and was limited to the adequacy of a technical procedural remedy. However, the Supreme Court clearly indicated and stated the commission was subject to such liability as is "otherwise" imposed by the laws of this State, and strongly indicated that "in proceedings for ouster it [the utility] would, of course, vigorously assert that it has, and is entitled to avail itself of, those [franchise] rights." Ibid. Such ouster proceedings would not involve the rule as to the consequential damages applicable in condemnation proceedings. See Delaware River Joint Toll Bridge Commission v. Colburn, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940). No such damage limitation would exist. This is not a condemnation proceeding by a utility to compel condemnation, and therefore the case at bar is not controlled by N.J. Bell Tel. Co. v. Delaware River Joint Comm., supra.
Based upon the above analysis, this court cannot subscribe to the notion that aforementioned cases are controlling in the present controversy.
*370 New York City Tunnel Authority v. Consolidated Edison Co., 295 N.Y. 467, 68 N.E.2d 445 (Ct. App. 1946), reargument denied 296 N.Y. 745, 70 N.E.2d 551 (Ct. App. 1946), represents the foundation for the application of the common-law rule of relocation to the Port Authority. It is upon this decision that the outcome in Port of N.Y. Auth. v. Hackensack Water Co., supra, and Port of N.Y. Auth. v. Consolidated Edison Co., 27 Misc.2d 45, 205 N.Y.S.2d 781 (Sup. Ct. 1960), rests. See also, First Nat. Bank of Boston v. Maine Turnpike Auth., 153 Me. 131, 136 A.2d 699 (Sup. Jud. Ct. 1957). The New York court suggests a willingness to imply the existence of the police power. The notion of implied authority as the basis for the Port Authority's power to require uncompensated relocation was re-emphasized in Port of N.Y. Auth. v. Consolidated Edison Co., 205 N.Y.S.2d, at p. 785:
"That nowhere in these enabling statutes is the Authority granted the power to compel uncompensated relocations of utility facilities. This very argument, however, was rejected in both the Transit Commission and Tunnel Authority decisions. The reverse construction, it was pointed out, is to be given the law: That the common-law rule applies until the Legislature provides otherwise and that such power as a State agency is to be implied unless expressly negatived." (Emphasis added)
This principle of construction is foreign to the law of New Jersey. The Port Authority is a body corporate and politic, and perhaps, in some respects it has a standing analogous to that of a municipal corporation deriving its power and authority to act solely from statute. However, unlike "municipal corporations formed for local government" which, by Art. IV, Sec. VII, par. 11 of the Constitution of 1947, are entitled to have statutes "liberally construed in their favor," the statutory powers of the Port Authority beyond those merely incidental to its operation are to be strictly construed, and any doubt or ambiguity is to be resolved against it. Cf., Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433 (1952) cert. denied 344 U.S. 838, 73 S.Ct. 25, *371 97 L.Ed. 652 (1952). Therefore, the decision in the present controversy cannot be controlled by a notion of liberal construction and power by implication.
Thus, it is necessary to determine whether the Port Authority has a status which would place it within the framework of the common-law relocation rule. Upon the evidence presented in this case, it is held that the Port Authority was created as an autonomous, multi-purpose, public authority, fashioned apart from the mode of ordinary government and not possessing a common-law power to compel uncompensated relocation on the part of a public utility. It has only those powers expressly granted. The Port of New York Authority was deliberately designed to have no implied coercive powers such as the police power, and it was directed to operate on its own financial resources so that it would be in all respects self-sustaining. It has no power to make these defendants subsidize it in the construction of facilities which the plaintiff has been directed to construct and support in all respects by the tolls and fees of its users.
The plaintiff has failed to show that it possesses the power, inherent or otherwise, to require uncompensated utility relocations by these privately owned utility corporations.
Judgment for defendants.