75 N.J. Super. 340 (1962)
183 A.2d 149
JOHN DOUD, JR., INFANT BY HIS GUARDIAN AD LITEM, JOHN DOUD, AND JOHN DOUD, INDIVIDUALLY, PLAINTIFFS-RESPONENTS,
v.
HOUSING AUTHORITY OF THE CITY OF NEWARK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1962.
Decided July 5, 1962.
*342 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. John J. Gaffey argued the cause for appellant (Messrs. Gaffey & Webb, attorneys; Mr. Aaron Dines on the brief).
Mrs. Janet W. Freeman argued the cause for respondents (Mr. Fred Freeman, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
In this negligence action a jury returned verdicts of $15,000 in favor of the infant plaintiff for personal injuries, and $648.85 in favor of his father for medical expenses. The trial court denied defendant's subsequent motion for a new trial of the infant's case, but set aside the verdict for the father upon the ground that his claim was barred by the statute of limitations. Defendant now appeals. No cross-appeal is taken.
*343 The action was predicated upon an accident which occurred in a multiple housing development in the City of Newark on July 16, 1952. At that time the infant plaintiff, then four years of age, resided with his grandmother Margaret Doud, a tenant. The case was consolidated for trial with another negligence action between the same parties in which the child suffered personal injuries on June 10, 1952 in a playground area on the premises. In that case the jury also returned verdicts in favor of both plaintiffs, and there also a motion for a new trial was denied as to the infant's claim but granted as to the father's recovery because of the running of the statutory limitation. Neither side has appealed from the resulting judgment therein.
The facts are not in substantial dispute. The housing development is of conventional design. It consists of ten multiple family dwellings with intercommunicating sidewalks used in common by tenants and their invitees, which eventually lead to a public thoroughfare. Areas are set aside and facilities are maintained thereon for the convenient use of the premises by the tenants and their families, control of which is retained by the landlord. Among the communal facilities is a "community hall" which is used by children for recreational purposes. This facility is located in a section of the dwelling unit which was occupied by the child and his grandmother. Originally this portion of the building was separated from a nearby sidewalk by a grass area, the perimeter of which was curved in contour, but when the efforts to raise grass therein proved to be impractical because of constant trampling by children at play, defendant paved it with "belgian block," set in concrete. Whether by intention or because of varying sizes of the stones, the surface was irregular, levels of the integrated blocks varying by 1/2"-1" to to 1 1/2" from those adjacent to them. In effect, the pavement provides the entranceway from the sidewalk to the community hall. Probably for aesthetic reasons, but necessarily to accommodate for the semicircular belgian block entranceway, the sidewalk, running *344 slightly downgrade as it led from the plaintiff's dwelling, curves to the left as it becomes conjoined with the belgian block pavement, in such fashion that one failing to negotiate the curve would find himself on the bumpy surface which we have described.
On July 16, 1952 the infant plaintiff and two young companions were at play, the particular form of which was to ride a two-wheel scooter, equipped with a brake, down the incline and to stop it before it would, by proceeding in direct course, leave the smooth surface of the sidewalk and be projected upon the uneven surface of the belgian blocks  in short, they were indulging the characteristically childlike impulse (not always outgrown) to "live dangerously." What was all but inevitable happened. John, riding the scooter down the incline, mounted the belgian block surface and by reason of its unevenness was jolted to the ground and sustained a spiral fracture of the middle and upper third of the femur of his right leg.
It is clear that the resident children had unrestricted use of the parts of the premises herein involved. In fact, it is not suggested by defendant that either by the operation of the scooter or by permitting it to be propelled upon the belgian blocks the child exceeded his invitation to use the premises. As will be pointed out, no more is said than that the portion of the premises on which the accident occurred was not physically suited to the use to which it was put. Hence the application of the child trespasser doctrine is not here involved. Cf. Simmel v. N.J. Coop Co., 28 N.J. 1 (1958); Restatement of Torts, § 339 (1934); Prosser on Torts (2d ed. 1955), p. 440.
It is settled that a landlord owes a duty of reasonable care with respect to the portions of a premises which are not demised and remain in the landlord's control. Michaels v. Brookchester, Inc., 26 N.J. 379, 382 (1958). Consequently, as regards the liability aspects of the case, the question is presented of whether from the stated facts a permissible inference may be drawn that defendant violated *345 its general duty to construct and maintain the premises so as to preclude reasonably foreseeable injuries to this infant plaintiff who, because of his tender years, presumptively was not chargeable with contributory negligence.
Defendant argues that there "was no proof in the case that the Belgian block area was designed for use by children or adults as a place where one would operate a scooter. Indeed the very nature of such a construction obviously would make it undesirable and unsuited for a scooter operation, which requires a level plane." (Emphasis added)
Accepting this premise, we conclude that it spells out a jury question of defendant's legal liability in this case. It was open to a jury to find that the defendant knew or should have known that small children customarily operated scooters and like contraptions on the sidewalk adjacent to an area which was so paved as to be unsuitable to such use, and that the contour of the sidewalk and the pavement was such as to make it reasonably foreseeable that whether intentionally or otherwise a child was likely to go upon the uneven, and hence dangerous, surface. Thus, the jury could rightfully have concluded that the defendant landowner was negligent in creating a hazard to children engaged in a permitted use of the premises.
We are satisfied that not only did the court properly submit the issue of negligence to the jury, but also that there was sufficient evidence of defendant's responsibility to withstand its motion for a new trial.
Defendant's second point is that the verdict of $15,000 was so excessive in amount as to clearly and convincingly make it appear to be the result of mistake, partiality, prejudice or passion. See R.R. 1:5-3(a).
An analysis of the testimony relating to the injury suffered by the plaintiff on July 16, 1952 reveals the following: Mrs. Doud did not appreciate the severity of the child's injury immediately after the accident. On the following morning, when he continued to complain of pain, she wheeled him in a carriage to the East Orange *346 General Hospital, where he was admitted. He came under the care of Dr. Thornton Stearns, a specialist in surgery and orthopedics. X-rays of the right leg were taken which disclosed the spiral fracture of the middle and upper third of the femur. The child was put in bed and placed in a Briant's traction. With the traction applied, the right leg was in a perpendicular position. The well known purpose of the traction was to hold the fragments of the fracture in alignment until callus or new bone formed at the site of the injury. The leg was kept in traction for 31 days. According to Dr. Stearns, the traction procedure was not painful. Thereafter, in accordance with the usual practice, a plaster of paris cast was applied to the right leg from the hip down. This was removed after six weeks, and on October 22, 1952 the child was discharged from Doctor Stearns' treatment. The doctor testified that at that time the fracture had united and the boy had recovered. There was some shortening of the right leg, but in the doctor's opinion it was probable that the normal growth of bone would rectify this condition as time went on. It appeared therefore, without dispute, that while the boy had suffered a severe injury, he effected a complete recovery without any residual functional disability of a permanent nature. Thus, the jury award must be considered as compensation for pain and suffering at the time of the injury and during the period of his convalescence.
Pain and suffering have no known dimensions, mathematical or financial. There is no exact correspondence between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this reason, the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation. Botta v. Brunner, 26 N.J. 82, 95 (1958). It is well settled that the court will interfere with the verdict on the mere ground of excessive damages only with reluctance, and never except in a clear case. Cabakov v. Thatcher, 37 N.J. Super. 249, 257 (App. *347 Div. 1955). However, where the amount of the verdict is so disproportionate with what is reasonably warranted by the proofs as to demonstrate that it was arrived at by mistake, the court will not hesitate to exercise its supervisory powers in the interest of achieving substantial justice. This is particularly true when a review of the case reveals the exposition to the jury of matters which would have a strong tendency to prejudicially affect their judgment. We find such to have been the situation here.
It was established that in August 1955 John brushed or collided with another boy in a passageway of the apartment dwelling and suffered what he called a "Charley horse." His grandmother took him to the East Orange General Hospital and X-rays were taken which disclosed the existence of a cystic area in the right femur. Comparison of these X-rays with those taken following the July 1952 accident revealed that the cystic area was not present at that time. The evidence further showed that on December 24, 1956 the boy, in running from a movie, jumped over a puddle, fell to the ground, and as a result again fractured his right femur, this time through the cystic area. On December 29, 1959 while running across a street, he fell and again fractured the right femur through the cystic area.
Plaintiff contended that the cyst and the two subsequent fractures were the proximate result of the injury of July 16, 1952. That issue was submitted to the jury and as a part of its verdict the jury found that these physical conditions were not causally related to the earlier accident.
While it was proper, and indeed necessary, for the plaintiff to establish medically the nature and effect of the injury sustained on December 24, 1956 and December 29, 1959, we are satisfied that the complex of medical proof attendant thereto had a marked potentiality, even though it was not so intended, to play upon the sympathy of the jury and to create a picture of unusual, recurrent, and almost continuous misfortune. As a result of the 1956 *348 accident the child underwent practically the same course of treatment by traction and cast as he had experienced in 1952. Following the 1959 accident it was determined that he had suffered a malunion of the fragments of the femur and it became necessary to perform an open operation on the leg to correct this condition. The operation was graphically described by Dr. Alfred J. D'Agostini, as follows:
"Q. Is there any special way, Doctor, to put that nail in? What do you have to do to put that nail in, Doctor?
A. * * * The fracture is here. You take the nail and shove it through, so it comes out here, all the way out. Then you align it, and shove it back down in, so it goes into the lower fragments. It's called a retrograde nail. You go up here. So it goes out. Then you align it together, and drive it back in.
Q. When you do it, is there any drilling required?
A. A lot of hammering.
Q. A lot of hammering?
A. A lot of hammering. It's a shocking procedure * * *."
Moreover, Dr. D'Agostini indicated that plaintiff went into shock during that operation. As Margaret Doud put it, "he almost died on the operating table." In giving his prognosis concerning the effects of the third fracture, Dr. D'Agostini indicated that the right foot might not develop to the size of the left, and that while he anticipated that the child would "get more of the length [of the right leg] back as he grows," he did not believe that the boy would develop musculature as well as on the other side, because of the protracted immobilization and its effect on muscle pull, which he likened to the sequelae of poliomyelitis.
Furthermore, it was established that in addition to the two accidents upon which suit was brought, and those of 1956 and 1959, in 1957 the boy had received a cerebral concussion when a heavy piece of pipe fell from a shower bath striking him on the head. If more were needed to enshroud the 12 years which John had survived at the time of the trial, there was the fact that he lived with his grandmother, whom he called "mother," and that his father *349 did not live with them. We are convinced that in combination these factors operated to influence the jury to return a verdict far greater in amount than would have been the case had these unusually saddening circumstances not been presented to them.
Broadly viewing the entire case, we think it inadvisable to exercise our right to order a remittitur on terms. We think it better that the issue of damages be retried in an atmosphere which will permit the jury to focus its attention on the physical injuries sustained by the plaintiff in the accident of July 16, 1952, unhampered by consideration of the adversity which plaintiff has suffered.
Accordingly, the case is remanded for a new trial on the issue of damages only. No costs.