HARRY GOLDBERG, PLAINTIFF-RESPONDENT, v. HOUSING AUTHORITY OF THE CITY OF NEWARK, A BODY POLITIC AND CORPORATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued September 10, 1962—Decided December 3, 1962.

Mr. *John Gaffey* argued the cause for appellant (*Messrs. Gaffey & Webb*, attorneys; *Mr. Sidney M. Schreiber*, of counsel).

Mr. *Seymour B. Jacobs* argued the cause for respondent (*Messrs. Balk & Jacobs*, attorneys).

Mr. *Samuel J. Davidson* filed a brief *amicus curiae* on behalf of the New Jersey Association of Housing Authorities.

The opinion of the court was delivered by

WEINTRAUB, C. J. ▇ While delivering milk to a tenant at defendant's housing project, plaintiff was beaten and robbed by two men. The attack occurred at about 1:30 P. M. in a self-service passenger elevator. Whether the assailants were tenants, guests of tenants, or intruders, is not known. The jury found for plaintiff and the Appellate Division affirmed. 70 *N. J. Super.* 245 (1961). We granted certification. 36 *N. J.* 233 (1961).

Plaintiff prevailed upon the single thesis that defendant had a duty to provide police protection.[1]

Defendant is a public corporation created by the City of Newark under the Local Housing Authorities Law (*N. J. S. A.* 55:14A–1 *et seq.*). It developed a number of projects. The one here involved embraces 19.15 acres, with 10 apartment houses, each of 12 stories, offering accommodations for 1,458 families. The residents at the time here involved numbered between 5,300 and 6,000. The Appellate Division said (70 *N. J. Super.*, at p. 255):

"We hold that defendant, since it created and maintained a housing project which, because of its size, physical composition and method of operation, was beyond the pale of regular municipal police surveillance, and yet because of these same factors was susceptible to criminal activities, was under a duty to provide such protection in the Hayes project as was necessary under the circumstances, and that a question

---

[1] The complaint charged negligence in general terms. The issue was particularized at the pretrial conference, as our rules direct. *R. R.* 4:29–1(a)(1) and 1(b)(2) and (7). Failure to provide police protection was the sole claim of negligence specified in the pretrial order, amended pretrial order, plaintiff's opening to the jury, plaintiff's expansive requests to charge, and the trial court's charge to the jury. In summation, plaintiff pressed the same theme, but in addition argued: "* * * What do they do in a big apartment house when they don't want these drifters in there lying in the hallways with knives in their pockets, which I read to you in all these exhibits? They lock the doors and give the tenants keys. They have a call box and push the button and we will let you in, or else they have a doorman outside in the more exclusive ones. All right, don't have a doorman outside, put locks in the doors, give authorized tradesmen either a badge or a key to get in."

We read this excerpt to acknowledge that doormen are furnished only in the "more exclusive" apartment houses, rather than a claim that defendant was negligent in not furnishing them here. Surely the case was not tried upon any such thesis. Nor was the case tried on the theory that locks should have been installed, and hence there was no evidence with respect to standard practice or the feasibility or utility of the suggestion. In any event, since the police-protection thesis was given to the jury, the judgment cannot be upheld if that thesis was erroneous. *Simmel v. New Jersey Coop Co.*, 28 *N. J.* 1, 13–14 (1958); *Guzzi v. Jersey Central Power & Light Co.*, 12 *N. J.* 251, 259–60 (1953).

of fact was presented for jury consideration as to whether the provisions made by defendant for private police guards were adequate. As to whether defendant's dereliction, if any, was the proximate cause of plaintiff's injuries and the damage he suffered, again it was for the jury to decide from the evidence whether the assault and robbery was a result of defendant's negligence. Plaintiff was not required to prove that the assault and robbery would not have taken place had defendant supplied additional protection. It is axiomatic that better policing would have acted as a deterrent. *Cf. Crammer v. Willston Operating Co., Inc.,* 19 *N. J. Super.* 489 *(App. Div.* 1952)."

The Appellate Division called the project "a city within a city." The description may be apt in terms of population but in no other sense. The project is not physically isolated from the neighborhood. Each apartment house fronts on a public street and still another street bisects the development, four structures being north of it and six south. The bisecting street is closed to traffic, being reserved for play. In terms of access by the police force of the city, the apartment houses are not distinguishable from high-rise apartments owned by private developers. In fact a police headquarters is located nearby.

The Appellate Division held that notwithstanding defendant's public nature, its liability for negligence must be adjudged on the principles of law applicable to the private owner of property. It reached that conclusion both because of the "proprietary" nature of the operation as that term is used in this field and because the statute under which defendant was formed reveals a legislative intent that the local authorities be accountable on that basis. 70 *N. J. Super.,* at *pp.* 250–253. Thus far we agree.

We cannot however agree that defendant has the duty to furnish police protection. That duty, we think, is the duty of government. Since the statute under which defendant was created does not impose such a duty upon it,[2] the question is

---

[2] In the Local Housing Authorities Law *(N. J. S. A.* 55:14A–1, *et seq.)* under which defendant was created, the Legislature found there existed "insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside" in such accommodations; that "such persons are forced to occupy overcrowded and congested

whether that obligation can be found upon the principles applicable to the private owner of residential property.

We note at once that no statute empowers the owner of residential property to have a police force. Such authority has been granted to private enterprise in very limited situations.[3] Hence the owner of residential property could "furnish" police protection only if the municipality agreed to assign special policemen at the owner's expense, a practice which seemingly rests upon *N. J. S. A.* 40 :47–19, which authorizes the governing body to appoint special policemen who shall not be part of the police force but who shall be under "the supervision and direction of the chief of police." See *McAndrew v. Mularchuk,* 33 *N. J.* 172 (1960) ; *Caronia v. Civil Service Commission,* 6 *N. J. Super.* 275, 280 (*App. Div.* 1950). And, from the wording of the statute, it would appear

dwelling accommodations"; that such conditions increase and spread disease and crime, and "necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities." *N. J. S. A.* 55 :14A–2. Finding that private enterprise cannot be expected to meet the problem, the Legislature authorized local government to create housing authorities which, with the aid of a federal program (42 *U. S. C. A.* §§ 1401–35), would provide "decent, safe and sanitary * * * urban or rural" accommodations which may include facilities for "community, health, recreational, educational, welfare or other purposes." *N. J. S. A.* 55 :14A–3(i). Although the foregoing reveals a legislative awareness of slums as breeding places of crime, I take it no one contends the statute meant to require defendant to operate an armed fortress or to provide its own police force or fire department or health department. Rather *N. J. S. A.* 55 :14A–11 provides only that the housing projects "shall be subject to the planning, zoning, sanitary and building laws, ordinances and regulations applicable to the locality in which the housing project is situated."

[3] Our statutes authorize the appointment of policemen only for railroads and other specified utilities, *N. J. S. A.* 48 :3–38 ; corporations organized to hold agricultural fairs and exhibitions, *N. J. S. A.* 4 :15–4, 5 ; the owner of a stud farm who holds fairs or exhibitions, *R. S.* 4 :15–8, 9 ; and universities and other schools of learning, *R. S.* 15 :11–16 to 20.

that a policeman so assigned would not be subject to the order of the owner of property but rather would be under "the supervision and direction of the chief of police."

Thus, defendant was here held liable for not furnishing a type of protection it cannot provide on its own decision. Of this, more later.

## I.

The question whether a private party must provide protection for another is not solved merely by recourse to "forseeability." Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide "police" protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner. And since hijacking and attack upon occupants of motor vehicles are also foreseeable, it would be the duty of every motorist to provide armed protection for his passengers and the property of others. Of course, none of this is at all palatable.

The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it. Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.

We are not aware of any decision which even approaches the result reached below. A brief review of the cases to which our attention has been drawn reveals they involved different risks or different relationships.

Common carriers have a duty to use a high degree of care to protect the persons of their patrons. In *Exton v. Central R. R. Co.*, 62 *N. J. L.* 7 (*Sup. Ct.* 1898), affirmed o. b. 63 *N. J. L.* 356 (*E. & A.* 1899), the railroad knew of prior scuffling between cabmen for business, but nonetheless did not eject or otherwise deal with them. Plaintiff was injured

when the scuffling recurred. In *Skillen v. West Jersey & Seashore R. R. Co.,* 96 *N. J. L.* 492 (*E. & A.* 1921), a passenger was injured by a "spitball." The record showed the conductor was aware of the antics of the schoolboys involved but did nothing to stop them. In *Sandler v. Hudson & Manhattan R. R. Co.,* 8 *N. J. Misc.* 537, 151 *A.* 99 (*Sup. Ct.* 1930), affirmed 108 *N. J. L.* 203 (*E. & A.* 1931), a passenger was injured by the crush of the crowd and the issue was the sufficiency of guards to deal with that regular phenomenon of defendant's business. In *Quigley v. Wilson Line of Massachusetts,* 338 *Mass.* 125, 154 *N. E.* 2d 77, 77 *A. L. R.* 2d 499 (*Sup. Jud. Ct.* 1958), plaintiff, a passenger on a vessel, was injured by the unprovoked assault of a drunken passenger. Defendant maintained a bar, and its guards, knowing the assailant had already been in another fracas that evening, failed to restrain him or to keep an eye on him. In *Neering v. Illinois Central R. R. Co.,* 383 *Ill.* 366, 50 *N. E.* 2d 497 (*Sup. Ct.* 1943), a young lady was attacked while waiting for a train on an unattended railroad platform at an early morning hour. The evidence showed the railroad knew that hoboes and tramps regularly loitered there and in the warming house thereon, and despite plaintiff's prior complaints, the railroad did nothing to clear the place of those characters or to protect its patrons against them. The court held the evidence sufficed to show a breach of duty (found to be a duty of ordinary care, rather than the higher duty owed by a carrier to a passenger). In each of these cases the hazard was specific, localized, and known to the defendant.

Another group of cases relates to the duty of the proprietor of a business operation open to the public to protect his guest from the predictable behavior of other guests. In *Williams v. Essex Amusement Corp.,* 133 *N. J. L.* 218 (*Sup. Ct.* 1945), plaintiff, attending a crowded theatre, was unintentionally floored by a running boy. There was no usher present. In *Reilly v. 180 Club, Inc.,* 14 *N. J. Super.* 420 (*App. Div.* 1951), two patrons at a bar engaged in "needling" which led to a scuffle in which plaintiff, a nonparticipant, was pushed

from his stool. The bartender failed to intervene despite portending events of which he was aware. In *Crammer v. Willston Operating Co., Inc.*, 19 *N. J. Super.* 489 (*App. Div.* 1952), a patron at a skating rink unwittingly upset two young ladies. The question was whether there were sufficient ushers to protect patrons from skating which was hazardous in view of the crowd. In *Becker v. City of Newark*, 72 *N. J. Super.* 355 (*App. Div.* 1962), defendant's employee, contrary to rules and regulations, permitted a five-year-old to ride a tricycle in the locker room. The lad unintentionally hit a bather. In *Lee v. National League Baseball Club of Milwaukee*, 4 *Wis. 2d* 168, 89 *N. W. 2d* 811 (*Sup. Ct.* 1958), an elderly lady was injured when a number of copatrons at a ball park scrambled for a foul ball. Defendant had provided ushers, with instructions to order patrons to keep their seats in such situations, and the court found ushers had theretofore proved effective in that regard. On this occasion, however, the usher had left his post to prepare to assume post-game duties on the playing field. Of course, none of those cases would support the proposition that proprietors of such places must provide police protection against an intruding thug. *Cf. Genovay v. Fox*, 50 *N. J. Super.* 538 (*App. Div.* 1958), reversed on other grounds, 29 *N. J.* 436 (1959).

In the following cases a triable issue was found with respect to criminal assaults but in each the basis of liability is foreign to the case before us. In *Lillie v. Thompson, Trustee, &c.*, 332 *U. S.* 459, 68 *S. Ct.* 140, 92 *L. Ed.* 73 (1947), the defendant railroad assigned its female employee to serve as a telephone operator from 11:30 P. M. to 7:30 A. M. in a one-room structure in a remote place in a railroad yard. The area was unlighted. She was to give messages to railroad employees who came to the structure, but no means were provided whereby she could tell who was at the locked door before opening it. The railroad knew the yard was frequented by "dangerous characters." In holding the facts sufficient, the court referred to section 302 of *Restatement of Torts*, comment *n*, thus indicating the theme to be that defendant cre-

ated "a situation which affords an opportunity or temptation to third persons to commit more serious forms of misconduct." Also basic was the duty of an employer to provide a safe place of work. In *McLeod v. Grant County School Dist. No. 128, 42 Wash. 2d 316, 255 P. 2d 360 (Sup. Ct. 1953)*, the court, by a vote of 5 to 4, sustained a complaint in which it was alleged that a 12-year-old female student was carried by some male students into an unlocked dark room near the gymnasium and there raped. The majority placed its holding upon the principle of section 320 of the *Restatement of Torts,* that "One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty of exercising reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other" under conditions there stated. In short, the child was compelled to attend school, and the school district had a duty to protect her from fellow students. In *Wallace v. Der-Ohanian, 199 Cal. App. 2d 141, 18 Cal. Rptr. 892 (1962)*, a child was a guest at a children's camp. She was quartered at night in a house unattended by any employee. She was ravished by an intruder. The court noted that defendant knew migrant laborers were working nearby and that defendant at times had employed a parolee. The court held defendant had failed to exercise "due care for the safety of a child left in her custody" (*p.* 894).

Finally we come to a group of cases dealing with responsibility of the owner of housing projects. In *Da Rocha v. New York City Housing Authority, 109 N. Y. S. 2d 263 (Sup. Ct. 1951)*, affirmed 282 *App. Div.* 728, 122 *N. Y. S.* 2d 397 (*2d Dept.* 1953), defendant, in a play area it provided, turned on a water outlet for the refreshment of children on a hot day, thereby attracting a large number who ran in and out of the spray. A child was struck by a cyclist, riding in violation of a posted regulation. Liability was grounded upon defendant's failure to enforce its own rules and failure to protect

children in an activity it set in motion. In *Geigel v. New York City Housing Authority*, 225 *N. Y. S. 2d* 891 (*Sup. Ct.* 1962), children laid out a baseball diamond utilizing the regular walks upon which they painted bases. Defendant, knowing this, did nothing to remove the bases or to stop the practice. A child using the walk was injured by a player. The court found defendant's failure in the circumstances constituted an invitation to ball games, an activity dangerous to others in that specific setting. In *Hansen v. New York City Housing Authority*, 271 *App. Div.* 986, 68 *N. Y. S. 2d* 71 (*2d Dept.* 1947), a child was struck by a swing on a playground provided by defendant. The court left open the question whether defendant had a duty to supervise the playground, but found a triable question of fact with respect to the physical conditions. Finally, in *Kendall v. Gore Properties*, 98 *U. S. App. D. C.* 378, 236 *F. 2d* 673 (*D. C. Cir.* 1956), a tenant was strangled by an insane employee of the landlord. The basis of liability was not a failure to provide police protection but rather negligence in hiring an unknown, without investigation or references, and sending him on the first day of employment to paint after hours in the apartment of a woman who lived alone.

The duty to provide police protection is foreign to the history of the landlord-tenant relationship. By the common law there was neither an implied covenant by the landlord of the fitness of the premises for the intended use nor responsibility in him to maintain the leased premises. With respect to the common areas in his control, his duty was to keep them in a reasonably safe condition. The landlord's obligation was indirectly affected by building codes and was modified by legislation relating to tenement houses. *R. S.* 55:1–1 *et seq.* See *Michaels v. Brookchester, Inc.*, 26 *N. J.* 379 (1958).

Subject to modifying legislation, a landlord offers to lease accommodations which a prospective tenant may take or not as he chooses. The landlord may offer sundry services, which of course will be reflected in the rental charge, but in the absence of statute, there is no duty to furnish them. Thus a

landlord may offer to provide a doorman during the day or around the clock, but he need not, and we know that such services are available only in the more luxurious apartment houses, beyond the reach of the average citizen. The sole statutory mandate with respect to attending personnel appears to be *R. S.* 55:6–13 of the Tenement House Act, which provides that if there are more than six families, "there shall be a janitor, housekeeper or other responsible person, who shall reside in said house, and who shall have charge of the same, if the board shall so require."

There are cases dealing with the liability of a landlord for theft of property of his tenants. Liability may exist if there is a failure to secure such property placed within the control of the landlord. And the landlord may be liable for theft if he carelessly enables a thief to gain entrance to the apartment of the tenant. See *McCappin v. Park Capitol Corp.*, 42 *N. J. Super.* 169 (*App. Div.* 1956), annotated in 58 *A. L. R. 2d* 1289 (1958). But no case holds a landlord is under a duty to provide police protection.

## II.

We come then to the question whether as an original proposition the owner of multi-family structures should have the duty to provide police protection. As we have said, the question is one of fairness in the light of the nature of the relationship, the nature of the hazard, and the impact of such a duty on the public interest. We think the duty should not be imposed, for a number of reasons.

The first reason is that we should not find the owner of property is liable for not furnishing police protection to deter invading criminals unless we also find he has the right to provide a police force to that end. We do not see how we can find that right in view of the statutes which vest in

government the power to constitute police forces, with certain exceptions, referred to above, which do not include the owner of residential property. But if the statutes were not in the way, we would nonetheless find a barrier in the public welfare. The police function is highly specialized, involving skills and training which government alone can provide. There is no room for the private devices of the frontier days. The proper approach is to state, if there be any doubt upon the subject, the duty of the constituted police forces to move wherever they need to go, not only to detect crime but also to prevent it.

This is not to say that a private person may shut his eyes to the fact of crime and indulge in conduct which aids or invites it. So a bailee of an automobile who leaves the car on a public street with motor running or key in the switch may indeed be liable to the owner if the vehicle is stolen. But it is something else to say that if he turns off the motor and removes the key, he must provide police protection for the vehicle because it may nonetheless be stolen.

The second consideration is the inevitable vagueness of the proposed duty. Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it. To which multi-family houses would the duty apply? Would it depend upon the number of tenancies? If so, can we now fix the number? And if the duty springs from a combination of tenancies and prior unlawful events, what kind of offenses will suffice, and in what number, and will crimes next door or around the corner or in the neighborhood, raise the obligation? And if a prescient owner concludes the duty is his, what measures will discharge it? It is an easy matter to know whether a stairway is defective and what repairs will put it in order. Again, it is fairly simple to decide how many ushers or guards suffice at a skating rink or a railroad platform to deal with the crush of a crowd and the risks of unintentional injury which the nature of the business creates, but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?

Must the owner prevent *all* crime? We doubt that any police force in the friendliest community has achieved that end. How then can the owner know what is enough to protect the tenants in their persons and property? (We add parenthetically that if the duty were found, there would be no rational basis to confine liability to crimes committed in a common hallway as distinguished from the tenant's apartment.) Here, a city policeman patrolled the interior walks from 8 A. M. to 4 P. M. and in addition two maintenance men were assigned to each building during that period. From 4 P. M. to 8 A. M. there were three special policemen working in shifts, and the record indicates the incidents of unlawful conduct were more numerous then than in the daytime. We assume that advocates of liability do not intend an absolute obligation to prevent all crime, but rather have in mind some unarticulated level of effectiveness short of that goal. Whatever may be that degree of safety, is there any standard of performance to which the owner may look for guidance? We know of none, and the record does not suggest one, and we are at a loss to understand what standard the jurors here employed. The charge to the jury was unrevealing; it simply left to 12 men and women the task of deciding whether a prudent owner would have done more, and whether, if defendant had, the robbers here would likely have been deterred. That of course was also the view of the Appellate Division.

Not only would there be uncertainty as to *when* the duty to furnish police protection arises and as to *what* measures will discharge the duty, there would also be exceptional uncertainty with respect to the issue of causation. This is so because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures. It would be quite a guessing game to determine whether some unknown thug of unknowable character and mentality would have been deterred if the owner had furnished some or some additional policemen. It must be remembered that police protection does not, and cannot, provide assurance against all criminal attacks, and so the topic presupposes that inevitably crimes

will be committed notwithstanding the sufficiency of the force. Hence the question of proximate cause is bound to be of exceptional difficulty.

Thus vagueness would here be conspicuous in all facets of the issue of negligence and causation. Perhaps this is one of the considerations which underlie the refusal in New York, where sovereign immunity was withdrawn by statute, to permit actions against a municipality for negligent failure to provide police protection, as distinguished, for example, from the failure to provide a bodyguard for an individual who, because of his aid to law enforcement, is threatened with criminal retaliation. See *Schuster v. City of New York*, 5 *N. Y. 2d* 75, 180 *N. Y. S. 2d* 265, 154 *N. E. 2d* 534 (1958).

Finally, we should not let our understandable concern for the unfortunate plaintiff obscure the fact that the burden of this duty would fall upon citizens who can hardly afford it. We are not dealing with a risk which can be passed along in an increase in liability insurance premiums. We are talking of the employment of men, perhaps the employment, if something like effective assurance is to be realized, of doormen around the clock to cover each of the entrances to the buildings, here a total of 20 entrances. If the owner must provide that service, every insurance carrier will insist that he do it. The bill will be paid, not by the owner, but by the tenants. And if, as we apprehend, the incidence of crime is greatest in the areas in which the poor must live, they, and they alone, will be singled out to pay for their own police protection. The burden should be upon the whole community and not upon the segment of the citizenry which is least able to bear it.

Hence we believe this most troublesome problem must be left with the duly constituted police forces. The job is theirs to prevent crime and to go wherever need be to that end. It may well be that the owner of multi-family housing may refuse to permit patrol of the common areas by the public police, *cf. State v. Smith*, 37 *N. J.* 481, 496 (1962), and if the owner should thus assert his property right, it would indeed be appropriate to visit upon him the losses sustained by those to

whom he denied the protection the public authorities were willing to provide.[4] But the duty to provide police protection is and should remain the duty of government and not of the owner of a housing project.

We do not mean that the owner may not seek authorization from appropriate public officials to provide further armed protection at his own cost. It may be in his interest to do so. That is a budgetary problem for him alone. It is for him to decide whether he can furnish such protection within the rental income he can obtain from his tenants, or, in the case of a public housing project, from such subsidy as the federal authorities may be able and willing to give. But it is something else to say that the owner *must* take such steps, indeed at the tenants' ultimate cost, on the pain of liability for damages.

The judgments of the Appellate Division and of the trial court are accordingly reversed.

---

[4] Plaintiff did not contend that defendant refused to permit the city's police department to furnish interior. patrols. On the contrary it appears from evidence offered by plaintiff for another purpose (to prove defendant had notice of alleged criminal events) that defendant insisted the duty was the city's but that nonetheless the Public Housing Administration, the federal agency which controlled the purse strings, was willing to consider additional expenditures if a need were shown and if it was satisfied the city was doing its share. Defendant's corporate minutes of June 12, 1957 reveal that the subject of police protection was raised (whether as to the nighttime only or to the daytime as well, we cannot tell). Commissioner Spatola, speaking of defendant's projects generally, said he found a need "of a mobile police force for Newark Housing—uniformed guards properly trained and sworn in," and offered a resolution which recited that "the Newark Police Department is under no statutory duty to offer to the Housing Projects interior patrols." The resolution was not seconded. Other commissioners expressed their views. One said, "I am opposed to a police force over and above or supplemental to the Newark Police force which I think is doing a wonderful job." Another said, "We asked the Newark Police Department for protection around Hayes. The crime center is not within our project but by people who come into our project. I think we should ask our Police Department to add more police to that area." Another said that "To put a police department of our own in there. would not be good. * * * No

JACOBS, J., joined by PROCTOR and SCHETTINO, JJ. (dissenting). We are here concerned with the Hayes housing project, located in Newark on a tract bounded by Springfield Avenue, West Kinney Street, Belmont Avenue, 17th Avenue and Hunterdon Street. It consists of ten residential buildings, each 12 stories in height, and an administration center which includes a boiler room, management offices and community building. There are walks, play areas and parking areas throughout the project which accommodated almost 1500 families and had a population between 5 and 6 thousand persons. A Newark police officer was assigned to patrol the walks and streets on the project grounds but he was not permitted to enter any of the project buildings unless specifically called for in the performance of police functions. The entrances to the residential buildings were never locked and no doormen or other attendants were ever assigned to them. As of the time here involved the defendant had three special

---

tenant or landlord has his own police department, not even Parkway Apartments, Ivy Hill or any of the larger apartments."

At the meeting of July 10, 1957 the executive director said "we have had considerable amount of difficulty to get approval from the P.H.A. [the federal agency] for the Special Police that we have on our projects"; that since the last meeting, "I called the Regional Office and discussed the problem of more adequate policing and I was met with this response 'that the feeling of the P.H.A. is that policing is not the primary responsibility of the Authority.' However, they are willing to meet with the Housing Authority and representatives of the city to analyse the needs of the areas in which our projects are located to the end that the city will do its share, the Housing Authority, with the consent of the P.H.A., will do its share." A committee was thereupon appointed to meet with the mentioned authorities.

The minutes of August 14, September 11, and October 16 reflect meetings with city officials at which proposals for sharing the problem were discussed. Mr. Hillman, apparently for the P.H.A., indicated his "approval was based on budgeting limitations, proof of need and that the city was doing all it should be doing." The city suggested defendant retain a retired police officer to study the extent of the need, but, according to the deposition of defendant's executive director, "we weren't satisfied with the scope that he intended to study. So, we therefore went for ——." The record reveals no more, doubtless because all of the foregoing was offered solely on the question of "notice."

policemen who worked in patrol shifts at the project between the hours of 4:00 P. M. and 8:00 A. M. No special policemen were assigned for the daytime hours between 8:00 A. M. and 4:00 P. M.

The plaintiff had been making milk deliveries at the project since it was first opened in 1954. He customarily made deliveries at 8:00 A. M. but on December 24, 1957 he altered his hours and was making deliveries at 1:30 P. M. in a building designated as 45-17th Avenue. While in the building's self-service elevator he was severely beaten and robbed and his assailants ran off and were never apprehended. In July 1958 he filed his complaint in the County Court seeking damages from the defendant for his injuries and charging that he suffered them because the defendant had negligently failed to "adequately supervise" the common passageways and elevators of the building, had negligently failed to take "proper measures" to keep the premises safe though it had knowledge of the dangers through the occurrence of prior assaults, and had negligently permitted dangerous acts to be performed and continued on the premises without taking "any precautions or safeguards" against their happening.

At the trial the plaintiff introduced evidence indicating that during the course of 1957 and prior to the assault upon him, the defendant had received many reports from its special policemen of crimes and acts of violence at the Hayes project; some of these reports related to daytime occurrences and many more bore on nighttime events. The daytime occurrences included several incidents involving armed intruders in parking lots at the project, a mugging in a hallway of a residential building, the arrest of a hallway loiterer who offered forceful resistance, and the molesting of a girl in the elevator of one of the residential buildings. A former special policeman at the Hayes project testified that during many monthly meetings prior to December 24, 1957 he had discussed the need for additional policing with Mr. Bland, who was employed by the defendant as manager of the Hayes project, and that he had recommended the employment of a

special policeman for assignment between the hours of 8:00
A. M. and 4:00 P. M.  In his testimony when called as a
witness for the defendant, Mr. Bland acknowledged that he,
in turn, had recommended to the defendant at or prior to
December 1957 that another special policeman be employed
at the project.

In addition to all of the foregoing, the plaintiff offered in
evidence police records of the Newark Police Department's
Fourth Precinct, which is located near the Hayes project.
These records referred to numerous complaints of crimes and
acts of violence at the project and included references not only
to nighttime occurrences but also to daytime occurrences such
as assaults and rapes or attempted rapes in the elevators and
hallways of the residential buildings.  The trial court refused
to permit these police records into evidence although it is
clear to me that they should have been admitted.  *Cf. N. J. S.*
2A:82–35; *Schwartau v. Miesmer*, 50 *N. J. Super.* 399, 413
(*App. Div.* 1958), certif. denied, 28 *N. J.* 34 (1958); *State
v. Wingler*, 25 *N. J.* 161, 180 (1957); 2 *Wigmore, Evidence*
§ 665 (*3d ed.* 1940);  6 *Wigmore, supra* §§ 1530, 1530A.
The trial court did, however, admit into evidence the official
records of meetings held by the Commissioners of the Hous-
ing Authority from June to October 1957 as bearing on the
extent of the notice to the defendant of alleged events at the
Hayes project prior to the date of the assault.  These minutes
contained many comments relating to crimes and acts of
violence at the defendant's housing projects and the necessity
for taking additional precautions.  Thus at the meeting held
on June 12, 1957 Commissioner Spatola referred to "a killing
in one project and a raping in another" and the need for a
mobile police force of "uniformed guards properly trained
and sworn in."  Commissioner Purcell noted that the Newark
Police Department had been asked "for protection around
Hayes" and expressed the view that "the crime center is not
within our project but by people who come into our project."

At a later meeting held on July 10, 1957, Mr. Danzig,
Executive Director of the Housing Authority, reported that

he had met with the managers and the administrative staffs of the projects being operated by the defendant and that they were of the belief that the projects were not "adequately policed." The Executive Director expressed the opinion that the special police should be augmented in specific areas and a committee was appointed to meet with the proper city officials and a representative of the Public Housing Administration. At a meeting of the Housing Authority on September 11, 1957 the Executive Director reported that conferences had been held with Newark's Police Commissioner who had suggested that the defendant engage a retired high ranking police officer to make a study as to the need for additional special policemen. At a meeting on October 16, 1957 the Executive Director reported that a further conference with the Police Commissioner would be held and that a report thereon would be submitted. Although the Executive Director had testified before trial that there was "some measure of crimes and juvenile delinquency" at the Hayes project and had testified again during the course of the trial, the record contains nothing to suggest that any protective action was taken by the defendant prior to the date of the assault on the plaintiff.

After the plaintiff completed his testimony, the defendant introduced testimony by Mr. Bland and Mr. Danzig along with a copy of a cooperation agreement between the City of Newark and the Housing Authority. That agreement provided that the city would furnish to the Authority the facilities, including police and health protection, which were furnished to "other dwellings and inhabitants in the City." Pursuant to this agreement the city did provide a police officer who patrolled the streets and walks of the project, but the understanding, as testified to by Mr. Bland, was that city policemen were "not allowed to go into the buildings." Similar testimony by Mr. Danzig was that city policemen were not permitted to enter the buildings of the project except when actually called because of the commission or threatened commission of a crime. Mr. Bland testified that the responsibility

of maintenance men assigned to the project's buildings was for "cleanliness" and other "janitorial duties," and there is nothing to suggest that they had any responsibility with respect to safety and order. At the close of all of the testimony the trial court submitted the case to the jury which returned a verdict of $6,000 in favor of the plaintiff. On appeal, the plaintiff was, of course, entitled to the benefit of all reasonable inferences which might be drawn from the evidence to support the verdict. See *Menth v. Breeze Corporation, Inc.,* 4 *N. J.* 428, 438 (1950); 5 *C. J. S., Appeal & Error* § 1562(4), *p.* 1222 (1958). The Appellate Division sustained the jury's verdict and the judgment entered thereon in an opinion reported at 70 *N. J. Super.* 245 (1961).

In its attack on the action of the Appellate Division, the defendant relied primarily on its position that it was under no duty to furnish any special "police protection" to guard against assaults. It did not deny that, as landlord, it retained possession and control of the hallways, elevators, and other common facilities, and owed a duty to keep them in reasonably safe condition. See *Taneian v. Meghrigian,* 15 *N. J.* 267, 272 (1954); *Hedges v. Housing Authority, Atlantic City,* 21 *N. J. Super.* 167, 170 (*App. Div.* 1952); *Doud v. Housing Authority of Newark,* 75 *N. J. Super.* 340, 344 (*App. Div.* 1962). It contended, however, that that duty related to the safety of the physical structure and did not extend to the furnishing of protection against crimes. Citing *Genovay v. Fox,* 50 *N. J. Super.* 538 (*App. Div.* 1958), reversed 29 *N. J.* 436 (1959), and *Prosser, Torts* 141 (*2d ed.* 1955), it relied on its stated proposition that "generally a property owner is not obliged to anticipate and guard against the criminal acts of others." Assuming that to be so, courts have nonetheless repeatedly held that where there are special conditions from which the owner or operator of the premises should recognize and foresee an unreasonable risk or likelihood of harm or danger to invitees from criminal or wrongful acts of others, he must take reasonable precautions which may, under the circumstances, fairly and justly entail the

employment of special guards or police. See *Exton v. Central R. R. Co.*, 62 *N. J. L.* 7, 11 (*Sup. Ct.* 1898), aff'd 63 *N. J. L.* 356 (*E. & A.* 1899); *Skillen v. West Jersey & Seashore R. R. Co.*, 96 *N. J. L.* 492, 494 (*E. & A.* 1921); *Sandler v. Hudson & Manhattan R. R. Co.*, 8 *N. J. Misc.* 537, 539, 151 *A.* 99 (*Sup. Ct.* 1930), aff'd 108 *N. J. L.* 203 (*E. & A.* 1931); *Williams v. Essex Amusement Corp.*, 133 *N. J. L.* 218, 219 (*Sup. Ct.* 1945); *Reilly v. 180 Club, Inc.*, 14 *N. J. Super.* 420, 424 (*App. Div.* 1951); *Crammer v. Willston Operating Co., Inc.*, 19 *N. J. Super.* 489, 490 (*App. Div.* 1952); *Becker v. Newark*, 72 *N. J. Super.* 355, 358 (*App. Div.* 1962); cf. *Neering v. Illinois Central R. R. Co.*, 383 *Ill.* 366, 50 *N. E.* 2d 497 (1943); *Quigley v. Wilson Line of Massachusetts*, 338 *Mass.* 125, 154 *N. E.* 2d 77, 77 *A. L. R.* 2d 499 (1958); *Lillie v. Thompson*, 332 *U. S.* 459, 68 *S. Ct.* 140, 92 *L. Ed.* 73 (1947); *McLeod v. Grant County School Dist. No. 128*, 42 *Wash.* 2d 316, 255 *P.* 2d 360 (1953); *Kendall v. Gore Properties*, 98 *U. S. App. D. C.* 378, 236 *F.* 2d 673 (1956); *Restatement, Torts* § 348 (1934). See also *Da Rocha v. New York City Housing Authority*, 109 *N. Y. S.* 2d 263 (*Sup. Ct.* 1951), aff'd 282 *App. Div.* 728, 122 *N. Y. S.* 2d 397 (1953); *Geigel v. New York City Housing Authority*, 225 *N. Y. S.* 2d 891 (*Sup. Ct.* 1962); *Hansen v. New York City Housing Authority*, 271 *App. Div.* 986, 68 *N. Y. S.* 2d 71 (1947); cf. *Amoruso v. New York City Transit Authority*, 12 *App. Div.* 2d 11, 207 *N. Y. S.* 2d 855 (1960); *Abbott v. New York Public Library*, 263 *App. Div.* 314, 32 *N. Y. S.* 2d 963 (1942); *Siegel v. 1536–46 St. John's Place Corporation*, 184 *Misc.* 1053, 57 *N. Y. S.* 2d 473 (1945).

In *Exton v. Central R. R. Co.*, *supra*, the plaintiff was knocked down by scuffling hackmen on a walkway used by passengers at the Central Railroad depot. She sued the defendant railroad and introduced evidence that there had been prior scuffling and that the defendant had taken no steps to prevent it and resulting injury to passengers. The court held that the matter was properly submitted to the jury which returned a verdict for the plaintiff. In the course of his

opinion, Justice Lippincott pointed out that the defendant, as a common carrier, was obligated to use reasonable care to keep its walkway safe for the use of its passengers and that while it was not required to furnish watchmen sufficient to overcome "all force or negligence, when unexpectedly happening" it was under a duty to take reasonable precautions to protect its passengers "from assaults from any quarter at which they might reasonably be expected to occur, under the circumstances of the case and the condition of the parties." 62 *N. J. L.,* at *p.* 14.

In *Neering v. Illinois Central R. R. Co., supra,* the principles expressed in *Exton* were applied to sustain recovery by a woman who had been assaulted at the defendant's railroad station while awaiting the arrival of a suburban train. The evidence indicated that, although there had been no prior assaults, the defendant had permitted hobos, tramps and vagrants to loiter about its station and could reasonably have anticipated the commission of unlawful acts on patrons. Justice Thompson noted that the circumstances evidencing the potential danger of assault upon passengers placed an affirmative duty upon the railroad to "exercise reasonable care and caution for its prevention." 50 *N. E. 2d,* at *p.* 503. See *Quigley v. Wilson Line of Massachusetts, supra,* where recovery by an assaulted ship passenger was sustained by the Supreme Judicial Court of Massachusetts on a finding that the shipping company had negligently failed to discharge its duty of providing suitable protection. 154 *N. E. 2d,* at *p.* 80. See also *Amoruso v. New York City Transit Authority, supra,* where the court held that the plaintiff had a cause of action against the Transit Authority for injuries sustained as the result of an assault upon him at a subway station; it stated that it was for the jury to determine whether the defendant had taken "reasonable precautions" in discharging its duty of care. 207 *N. Y. S. 2d,* at *p.* 856.

In *Crammer v. Willston Operating Co., Inc., supra,* the plaintiff was injured at a skating rink when a young man skated rapidly between her and her companion and threw her

to the ground. The rink was crowded, the skating was very fast, and there were some acts bordering on rowdyism. There were two guards in attendance although ordinarily three were employed. In sustaining the judgment awarded to the plaintiff, the Appellate Division noted that the defendant's duty of due care extended "to protection against the acts of third persons if he ought reasonably to have anticipated the occurrence" (19 *N. J. Super.*, at *p.* 490) and that the evidence justified the inference that "better policing of the rink would have deterred" the injurious conduct. 19 *N. J. Super.*, at *p.* 492. See *Lee v. National League Baseball Club of Milwaukee,* 4 *Wis. 2d* 168, 89 *N. W. 2d* 811, 814 (1958).

The principles underlying *Crammer* have been widely applied to varying situations in decisions which may carry implications bearing even more closely on the case at hand. In *Wallace v. Der-Ohanian,* 199 *Cal App. 2d* 141, 18 *Cal. Rptr.* 892 (1962), the court sustained a recovery from a camp operator by a child who had been attacked by an intruder; it found that the occurrence "was one which the defendant should have foreseen and better guarded against." 18 *Cal. Rptr.*, at *p.* 895. In *McLeod v. Grant County School Dist. No.* 128, *supra*, the court sustained recovery from a school district by a child who had been attacked in the school gymnasium. The court held that a jury could properly find from the circumstances that the occurrence "was a danger reasonably to be anticipated" and that the school district was negligent in failing to take proper precautions to prevent it. 255 *P. 2d*, at *p.* 364. In *Abbott v. New York Public Library, supra*, the court noted that the defendant owed a duty of care to keep its place reasonably safe and that this included a duty to supervise it adequately "so that persons lawfully using it are not unreasonably exposed to danger"; it held that a visitor at the library had a cause of action against the library for injuries sustained when he was assaulted by another visitor whose dangerous tendencies had earlier been brought to the library's attention. 32 *N. Y. S. 2d*, at *p.* 966. In *Lillie v. Thompson, supra*, the plaintiff was employed by the

defendant as a telegraph operator to work alone at night in an isolated part of the railroad yard. While at work she was beaten by an intruder and seriously injured. She sued her employer for failing to take adequate precautions for her safety. In holding that she had a cause of action, the Supreme Court pointed out that it was irrelevant that the foreseeable danger was from criminal conduct since the defendant "nonetheless had a duty to make reasonable provision against it." 332 *U. S.*, at *p.* 462, 68 *S. Ct.*, at *p.* 142, 92 *L. Ed.*, at *p.* 75.

In *Kendall v. Gore Properties, supra,* Miss Whitman was a tenant in an apartment building operated by the defendant. She was choked to death by Hickey who had been given a key to her apartment by the defendant for the purpose of painting it. There was evidence from which a jury could find that care had not been taken in selecting Hickey or in supervising his activities. In holding that the administratrix of the estate of Miss Whitman had a cause of action against the defendant which should be submitted to the jury for its determination, the court broadly expressed its views as to the landlord's duty of care under modern conditions and as to various hazards, noting that if the landlord knows, or in the exercise of ordinary care ought to know, of a dangerous situation and "fails to take such steps as an ordinarily prudent person, in view of existing circumstances, would have exercised to avoid injury to his tenant, he may be liable." 236 *F. 2d* at *p.* 680. See also *Siegel v. 1536–46 St. John's Place Corporation, supra,* where the defendant was held liable for injuries from a dog bite suffered by the plaintiff while he was walking along a common stairway of the apartment house owned by the defendant; the court pointed out that the defendant-landlord was under a duty to keep the common ways of the apartment in a reasonably safe condition and that this duty "extended to the exclusion of known vicious animals from frequenting thereabout." 57 *N. Y. S. 2d*, at *p.* 474. *Cf. State of Maryland v. Manor Real Estate & Trust Company,* 176 *F. 2d* 414 (4 *Cir.* 1949), where the United States

Government was held liable because of the death of a tenant from a disease transmitted by means of the bite of a flea from an infected rat at premises operated by the Federal Public Housing Authority; the court found that the Authority had not discharged its obligation to exercise due care in its maintenance of the common areas of the premises. 176 *F. 2d,* at *p.* 416.

In *Da Rocha v. New York City Housing Authority, supra,* the plaintiff was a child of a tenant at a 40-acre city housing project. He was injured by a bicycle improperly ridden along one of the paths within the project. Although the area was policed by three guards, none was observable at the time of the accident. In holding that the plaintiff had a cause of action which could be asserted against the Housing Authority, the court pointed out that the absence of any supervision from a guard was vital and that it could fairly be inferred that if he had been present, the bicycle rider would have kept away. In *Geigel v. New York City Housing Authority, supra,* the plaintiff was injured when a boy who was playing punchball at the housing project ran into her. She sued the Housing Authority and introduced testimony that there was no guard or housing officer on duty in the immediate vicinity at the time of the accident and that the defendant had ample notice that children had been using the area for play purposes. In awarding a judgment to the plaintiff, the court pointed out that the defendant was under a duty to keep the area "in a reasonably safe condition for the protection of its tenants" and that it could not ignore "the foreseeable dangers." 225 *N. Y. S. 2d,* at *p.* 893.

It must be borne in mind that in the instant matter the court is not at all concerned with the ordinary private multi-dwelling or apartment house. There the owner's customary reliance on the measure of protection afforded by the public police force against criminal acts by intruders may perhaps be viewed, as a matter of law, as not unreasonable in relation to the nature of the risk involved. *Cf. Genovay v. Fox, supra,* 50 *N. J. Super.,* at *pp.* 551–552. Here, the court is con-

cerned with a special situation in which the defendant has built a high-rise multi-unit housing project which, by virtue of its size, composition and mode of operation, presents special dangers requiring special precautions. See Mulvihill, "Problems in the Management of Public Housing," 35 *Temp. L. Q.* 163, 179 (1962); *cf. Jacobs, The Death and Life of Great American Cities* (1961); Harrington, "Slums, Old and New," 30 *Commentary* 118 (1960); *Salisbury, The Shook-Up Generation* (1958). Such patrol and surveillance activities as were engaged in by the Newark police officers were confined strictly to the streets and walks. They were not permitted to enter the buildings and the Housing Authority relied entirely on its own employees for supervision in the buildings. It engaged special policemen between the hours of 4:00 P. M. and 8:00 A. M. but decided, for obscure reasons of its own, not to engage any special policemen between the daytime hours of 8:00 A. M. and 4:00 P. M. It took no action to alter its decision, notwithstanding specific recommendations from one of its special officers and its project manager at Hayes, notwithstanding its awareness of the daytime crimes and acts of violence at Hayes, and notwithstanding the repeated expressions by individual housing commissioners of the need for additional policing at Hayes and elsewhere. Nor did it take any action to alter its policy of permitting the entrances to the residential buildings at Hayes to remain always unlocked and unattended. Indeed, the record indicates that, though the daytime special dangers were evident, the defendant took no special precautions at all with respect to them. Under the circumstances it seems clear to me that a jury could readily find, that a reasonably prudent person, situated as was the defendant, would have foreseen and recognized an unreasonable risk or likelihood of harm or danger to invitees such as the plaintiff, from criminal or wrongful acts of others, and would have taken reasonable protective precautions through the enlargement of its own special police force or in other appropriate manner. *Cf. New York Times,* September 13, 1962, *p.* 1, *col.* 5.

The defendant has advanced the contention that, assuming dereliction of duty on its part in failing to take precautions such as the employment of a daytime special policeman, there is nothing to indicate that his presence would have prevented the assault. It is, of course, true that no one knows for certain what the effect of a daytime policeman would have been; nor does anyone know whether the employment of additional guards would have prevented the injuries in *Crammer, Geigel,* or in the many other cases where recovery was allowed. Nevertheless, it is likely that the daytime policeman would have served as a deterrent and it could reasonably be found that his absence was, in a legal sense, the proximate cause of the plaintiff's injuries. See *Crammer v. Willston Operating Co., Inc., supra,* 19 *N. J. Super.,* at *p.* 492; *Lee v. National League Baseball Club of Milwaukee, supra,* 89 *N. W. 2d,* at *p.* 814. In the *Lee* case, a spectator at a ball game was injured when other spectators stampeded to recover a foul ball. The plaintiff recovered a judgment for money damages against the ball club and this was sustained by the Supreme Court of Wisconsin in an opinion which held that the jury was properly permitted to find that the defendant was negligent in failing to have an usher at his assigned position in the area. In response to the defendant's contention that even the presence of the usher would not have prevented the injury, the court pointed out that the jury could reasonably have inferred that the usher's presence "might have been effective" and that his absence constituted a "substantial factor" in the ultimate event. 89 *N. W. 2d,* at *p.* 815. A comparably broad approach may be found in recent cases in New Jersey where the court held that it is sufficient if the defendant's negligence constituted a substantial factor in the occurrence; within wide outer limits, the issue of proximate cause is justly left to the jury. See *Rappaport v. Nichols,* 31 *N. J.* 188, 203 (1959); *Martin v. Bengue, Inc.,* 25 *N. J.* 359, 374 (1957).

The cited precedents overwhelmingly support the plaintiff's cause of action. They may, of course, be differentiated

factually since none of them involved a negligence action for injuries suffered in the elevator of a Newark housing project. *Cf.* Frankfurter, J., concurring in *Still v. Norfolk & Western Railway Co.,* 368 *U. S.* 35, 82 *S. Ct.* 148, 7 *L. Ed. 2d* 103, 111 (1961). But they may not be differentiated legally since all of them involved soundly grounded principles which are patently applicable; indeed, most of them involved circumstances far less compelling than those presented here. Highrise housing projects have brought with them problems which have caused serious concern throughout the nation. See *Harrington, supra,* at *p.* 122; *Salisbury, supra,* at *p.* 75. *Cf.* *Newark Evening News,* November 15, 1962, *p.* 7, *col.* 1; November 19, 1962, *p.* 20, *col.* 1. Jane Jacobs has referred specially to the dangers of violence in corridors and elevators of the projects and has suggested that the reasonably safe way of dealing with them is to provide full-time attendants (*Jacobs, supra,* at *p.* 399); and others have suggested the possibility of suitable alarm or "video guard" systems. See the *New York Times,* March 14, 1960, *p.* 20, *col.* 2. When an act of violence occurred recently at a New York City housing project, locks were changed and additional private guards were engaged. See the *New York Times,* September 13, 1962, *p.* 1, *col.* 5; September 15, 1962, *p.* 27, *col.* 1. Here the Newark Housng Authority had recognized some dangers and the need for taking precautions by engaging special policemen who were presumably employed in accordance with *N. J. S. A.* 40:47–19 and the Civil Service specifications relating to housing guards. But it neglected to engage any for assignment during the daytime hours or to take any other suitable precautions though it was fully aware of the serious daytime as well as nighttime dangers. That this amounts to actionable negligence finds ample support not only in the precedents but also in the strong underlying considerations of fairness and justice.

The defendant's duty was to take reasonable precautions; that duty was no more vague than is the test of reasonableness throughout our law generally. In *Nash v. United States,*

229 *U. S.* 373, 33 *S. Ct.* 780, 57 *L. Ed.* 1232 (1913), Justice Holmes noted that even in the field of criminal law a test comparable to reasonableness may be applied without infringing any principles of fairness or due process. Similarly in *United States v. Ragen,* 314 *U. S.* 513, 62 *S. Ct.* 374, 86 *L. Ed.* 383 (1942), the Supreme Court, through Justice Black, pointed out that the fact that a penal statute is so framed as to require a jury to determine the question of reasonableness "is not sufficient to make it too vague to afford a practical guide to permissible conduct." 314 *U. S.,* at *p.* 523, 86 *L. Ed.,* at *p.* 390. Here there was no issue as to how many daytime guards would have been sufficient. The fact was that the defendant failed to engage even a single daytime guard or to take any other protective precautions insofar as daytime dangers were concerned. When the very serious nature of the dangers is considered, the cost of a daytime guard or other reasonable precaution fades into insignificance. Any suggestion that the defendant may fairly be entitled to an immunity because of the high-minded purposes of its facilities is readily dissipated by reference to judicial opinions such as *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958), where the court set forth fully the compelling reasons for discarding the common law immunity of charitable institutions. Furthermore, the pertinent legislation itself may properly be said to have rejected any notion that the Housing Authority was to be immunized from ordinary tort responsibility. See 70 *N. J. Super.,* at *pp.* 250–253; *cf. Taylor v. N. J. Highway Authority,* 22 *N. J.* 454, 466 (1956); *McCabe v. N. J. Turnpike Auth.,* 35 *N. J.* 26 (1961). See also *Federal Housing Administration v. Burr,* 309 *U. S.* 242, 245, 60 *S. Ct.* 488, 84 *L. Ed.* 724, 728 (1940); *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 *U. S.* 381, 59 *S. Ct.* 516, 83 *L. Ed.* 784 (1939); *cf. Knowles v. Housing Authority of the City of Columbus,* 212 *Ga.* 729, 95 *S. E.* 2d 659, 61 *A. L. R.* 2d 1241 (1956); *Muses v. Housing Authority of City & County of San Francisco,* 83 *Cal. App.* 2d 489, 189 *P.* 2d 305 (1948); *Manney v. Housing Author-*

*ity of the City of Richmond,* 79 *Cal. App.* 2d 453, 180 *P.* 2d 69 (1947); *Housing Authority of Birmingham Dist.* v. *Morris,* 244 *Ala.* 557, 14 *So.* 2d 527 (1943).

The procedural effort to confine the plaintiff narrowly to a thesis or theory of action based solely on the absence of special police seems to me to be a reversion to a bygone period where technism was placed above justice. In any event, it lacks the support of the trial record. The plaintiff's complaint did not mention special police but asserted that the defendant had failed to exercise proper supervision over the common passageways and elevators, had failed to take proper measures to keep the premises safe though it had knowledge of the dangers, and had negligently permitted the performance of dangerous acts without taking any precautions or safeguards against their happening. The supplemental pre-trial order did refer to special police, but it also referred to the absence of "other safeguards" and specifically set forth the plaintiff's contention that "the defendant failed to take proper and adequate precautions and measures to safeguard persons on the premises including the plaintiff, with regard to their personal safety." During the trial there was considerable evidence with respect to the insufficiency of the special police but there was also evidence indicating that the building was never locked, that no doorman or other attendant was ever assigned to it, and that no pertinent protective daytime precautions were ever taken. In his summation to the jury, counsel for the plaintiff stated that his case was predicated on the negligence of the defendant "in failing to furnish reasonable safety and protection to this plaintiff"; and while he paid considerable attention to the absence of special daytime police, he also referred to the "open self-service elevators," to the fact that intruders slept "in the hallways and the stairways," and to the fact that there were no locks on the doors or attendants in the building. At one point in his summation he noted that representatives of the Housing Authority had not testified why "they didn't put

police there in the daytime, why they didn't put locks on the doors, why they didn't have an attendant in the daytime."

In his charge to the jury the trial judge recognized the broad nature of the plaintiff's claim. He did not at any time suggest that the claim rested solely on the absence of special police but, on the contrary, instructed the jury in the early part of his charge, as follows:

"The plaintiff in this action charges that his injury and loss of property was caused by the defendant in that it failed to exercise reasonable care for the safety and protection of persons having a lawful right to be on the premises. The defendant on the other hand asserts that it had no duty to provide the plaintiff with police protection, that it did not fail in any respect to any duty it owed the plaintiff because it could not have reasonably foreseen any danger to the plaintiff of the sort here encountered."

In the remainder of his charge the trial judge dealt mainly in general terms with fundamental principles of negligence, contributory negligence and causation. He instructed the jury that the test to be applied by it in deciding the issue of negligence was whether "the defendant exercised in the operation of its Housing Authority the care which a reasonable, prudent man would have exercised at the time and place and under the circumstances." And in summarizing the responsibility of the jury, he suggested that it consider whether the defendant was aware of the danger, whether there was a failure by the defendant to exercise reasonable care, and whether the defendant's failure was the efficient, producing cause of the injury. In the light of all of the foregoing it is difficult to see how it may now be said that the plaintiff confined his claim strictly to the absence of police or that the case was submitted to the jury on that issue.

After a full trial which was free of any prejudicial error (70 N. J. Super., at pp. 255-256), the jury found that the defendant had acted unreasonably in failing to take protective precautions despite notice of the serious dangers and that it should compensate the plaintiff for his resulting injury. Its verdict was firmly based on the evidence and on established

principles of negligence law and the record presents no rational ground for upsetting it. Indeed, as I view the matter, the upsetting of the verdict not only operates unjustly to the plaintiff but also disserves the strong policy considerations which dictate that, in the maintenance and operation of its project, the defendant be placed under the traditional duty of due care and be justly accountable to those injured as the result of its breach. I vote to affirm.

*For reversal*—Chief Justice WEINTRAUB, and Justices FRANCIS, HALL and HANEMAN—4.

*For affirmance*—Justices JACOBS, PROCTOR and SCHETTINO —3.